**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **HUAWEI TECHNOLOGIES CO. LTD.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. _____** |
| **T-MOBILE US, INC. and T-MOBILE USA, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

1.      Plaintiff Huawei Technologies Co. Ltd. ("Huawei") files this Original Complaint for Patent Infringement against T-Mobile US, Inc. and T-Mobile USA, Inc. (collectively "T-Mobile" or "Defendant") and alleges as follows:

**NATURE OF ACTION**

2.      Founded in 1987, Huawei is a global leader of information and communication technology ("ICT") solutions.  Continuously innovating to meet customer need, Huawei is committed to enhancing customer experience and creating maximum value for telecommunications carriers, enterprises, and consumers.  Huawei's telecom network equipment, IT products and solutions, and smart devices, such as telepresence products, transport and core network equipment, fixed and radio access products, and fiber infrastructure products, are deployed and used in 170 countries and regions and serve over one-third of the world's population.  In the fiscal year 2014, Huawei achieved $46.5 billion in sales revenue.  With its annual sales revenue, Huawei was ranked 228 in the Global Fortune 500 in 2015.

3.      Huawei is also a leader in research, innovation, and implementation of future networks.  Huawei currently has over 170,000 employees globally.  Among them, over 76,000 work in its Research and Development Departments, comprising over 45% of Huawei's workforce.  More than 45% of those researchers have Master's degrees, and over 1,600 of Huawei's researchers have Doctorate degrees.

4.      Indeed, R&D has always been at the core of Huawei's business.  Although Huawei started its business reselling third party telecommunication products, it was decided in Huawei's early years that the company must shift its focus to expand its own R&D and develop its own products.  Since then, Huawei has heavily invested in R&D and routinely spends no less than 10% of its annual revenue on innovation.  In 2014 alone, Huawei invested $6.6 billion (14.2% of its total 2014 revenue) in research and development.  Over the past decade, Huawei has invested nearly $30.7 billion in research and development in total.  Huawei's R&D efforts are focused on addressing current customer needs, as well as long-term technology research and standardization.  In pursuit of these goals, Huawei has assembled a global team with thousands of scientists and top engineers in the United States, Europe, and Japan to staff its first-class R&D department.  Globally, Huawei has 16 research and development centers in the United States, Germany, Sweden, France, Italy, Russia, India, and China.  Huawei, through its subsidiaries, invests a significant portion of its U.S. revenue into local research and development.  By 2014, Huawei's research and development investment in the U.S. reached approximately $1.1 billion.  Huawei's innovations are central to important cutting-edge technologies, including ultra-broadband solutions, such as 100G super-fast data transmission, and LTE and WiMAX wireless networks.

5.     As a result of Huawei's substantial dedication to R&D in the telecommunications industry over the past three decades, Huawei has witnessed and contributed to the evolution of telecommunication networks from the Wire Link Age, into the Wireless Age, and developing from 2G to 3G to 4G, with current progress toward 5G.  Over the course of this evolution, Huawei has been responsible for several of the industry's notable achievements and milestones.

6.     In the Wire Link Age, due to its heavy investment in R&D in its early years, in 1993 Huawei successfully launched a new line of fixed network switch products, the centerpiece of which was the C&C 08 switching product, which proved to be a tremendous success in rural areas of China, with a rapid coverage of over 300 regional networks.

7.     Entering the Wireless Age, as early as 1997, Huawei launched the first-ever GSM infrastructure products engineered solely by a Chinese company. Three years later, Huawei's revenue had reached $1.9 billion, $100 million of which was from overseas sales. Along with great market success, Huawei has always been significantly ahead of its competitors in bringing major innovations in cellular technology to market.  Shortly after its success with distributed base stations, recognized as customer-centric innovations, Huawei was the first infrastructure supplier to launch the unique SingleRAN technology in 2008, which is now the industry norm. The SingleRAN solution supports GSM, universal mobile telecommunications system ("UMTS"), code division multiple access ("CDMA"), WiMAX, and LTE, i.e., all relevant 2G, 3G, and 4G standards, all in a common platform.  In 2009, Huawei deployed the world's first commercial 4G LTE network in Oslo, Norway, sharing the first commercial 4G LTE network with Ericsson in TeliaSonera.   In 2010, Huawei achieved the world's fastest LTE-A downlink speed, up to 1.2 Gbps at CTIA Wireless 2010 in Las Vegas, Nevada, and successfully demonstrated simultaneous voice calling and high definition video streaming over LTE and

LTE-A networks for Cox Communications, the third-largest cable provider in the United

States.   These and other accomplishments earned Huawei the awards for "Best Contribution to

R&D for LTE" and "Best Contribution to LTE Standards" at the LTE North America Awards in

2011. At the LTE World Summit, Huawei won numerous awards, such as the "Best LTE traffic

management product" and "Innovation in HetNet development" awards in 2014, and the "Best

NFV Innovation of the Year" and "Biggest Contribution to 5G Development" awards in 2015.

Huawei was the only company that won two awards in both years.  Huawei also won the "Most

innovative service launch enabled by IMS" with its "Convergent Conference" solution at the

2012 IMS World Forum, the "Best Integrated IMS Solution" award at the 2013 IMS World

Forum, and the "Best VoLTE Product" for its end-to-end (E2E) voice and video over LTE

(V2oLTE) solution and "Most Innovative Virtualised IMS Solution" for its Cloud IMS solution

at the 2014 IMS World Forum in Barcelona, Spain.  Among other awards, Huawei was ranked

the fifth most innovative company in the entire world by Fast Company in 2010, and one of the

World's 50 Most Innovative Firms by BCG in 2015.

8.      During the past 20 years, Huawei has endeavored to drive the mobile industry

forward through collaborations on commercialization, innovation, and standardization.

According to Current Analysis, Huawei is the clear overall leader due to the strength of its 3GPP

wireless communication portfolio, offering a broad variety of network solution options including

high- and low-capacity offerings and a range of power output levels and architectures.

9.      Huawei actively participates and drives core network-related standards in eminent

organizations, such as 3GPP, IETF, ITU-T, GSMA, ETSI, CCSA, IMTC, SIP Forum, MSF,

NGMN, OMA, 3GPP2, etc.  *See, e.g.*,

http://webapp.etsi.org/3gppmembership/Results.asp?Member=ATIS&Member=ETSI.  By the

end of 2014, Huawei was a member of approximately 170 Standard Setting Organizations ("SSOs").  More than 2,930 contributions submitted by Huawei were approved by these organizations.  In addition, Huawei has obtained 76 leadership positions in these core network technology related SSOs, such as chairs, rapporteurs, and editors.

10.     Huawei's commitment to innovation is a major reason why it holds one of the largest patent portfolios in the world.  As a result of Huawei's significant investment in R&D, Huawei presently holds over 41,000 issued patents, broadly covering the major jurisdictions of the world.  Huawei has over 24,000 granted patents in China and has been the No. 1 patent owner and applicant in China for many years.  Huawei also routinely applies for 4,000 to 5,000 patents globally each year.  In 2014, Huawei and its affiliated companies obtained 1,155 patents issued by the United States Patent & Trademark Office, the 28th most of any company.  That same year, Huawei obtained 503 issued patents from the European Patent Office, the 7th most of any company.  Huawei's growing patent portfolio is the natural result of its significant investments in R&D and contributions to the ICT industry.  Recently, the World Intellectual Property Organization (WIPO) ranked Huawei as No. 1 for international patent applications across all industries.  Huawei's significant efforts in research and development demonstrate the value that Huawei places on innovation, and on sharing its efforts with the public, in return for a limited right to exclusive use of its inventions.

11.     With the rapid pace of technical innovation in telecommunications, different types of telecommunication technologies are in use simultaneously in the same air interface.  For example, 4G LTE and Wi-Fi are often in use at the same time, with 4G LTE being used for broad range coverage, and Wi-Fi being used for short distances and high speed access. But no matter which access technology is in use, consumers want to enjoy the convenience of hearing

and talking to each other regardless of the physical distances from each other and regardless of the physical location where each speaker is located.  Indeed, today's consumer has come to expect that their communications device will work at any time, in all locations.  To meet this growing demand, VoWiFi (Voice over Wi-Fi) and VoLTE (Voice over LTE) have been developed.  These technologies were designed to eliminate coverage limitations in older technologies.  As a result, it has become very important for technology developers and network operators to create systems that allow subscribers to take advantage of these newer technologies by supporting transfer between networks.  For example, network operators are now expected to provide for seamless and reliable transfer of a call initiated on a 4G LTE network to a Wi-Fi network where the call will continue without interruption to the parties on the call.

12.     Huawei, as a telecommunication technologies developer and industry leader, due to its continuous investments in the technical fields of the industry, holds multiple patents related to techniques for managing a transfer scenario.  For example, Huawei's patents cover transfer management techniques when a mobile device moves between different radio access technologies, such as, for example between 3G and LTE networks.  Huawei's patents cover wireless network techniques related to, for example, security negotiations during transfers and the avoidance of dropped calls during transfers.

13.     As detailed below, T-Mobile has used and is using Huawei's patented technology without license.

14.     T-Mobile operates wireless networks across the country.  T-Mobile's wireless networks include those branded as MetroPCS.  Specifically, T-Mobile's 2014 Annual Report notes that "T-Mobile US, Inc. was formed in 2013 through the business combination between T-Mobile USA and MetroPCS Communications, Inc. ('MetroPCS')."  T-Mobile 2014 Annual

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                        6

Report, pg. 4 (*available at*

http://www.sec.gov/Archives/edgar/data/1283699/000128369915000010/tmus12312014form10-

k.htm).

15.     T-Mobile has grown and continues to grow its wireless networks despite not

having a license to Huawei's patents that enable the networks.  For example, T-Mobile admits

that:

> We have substantially completed the process of upgrading our network to LTE,
> which provides our customers with the fastest nationwide LTE services. Our LTE
> network covered 265 million people as of December 31, 2014, compared to more
> than 200 million people as of December 31, 2013.  This surpassed our year-end
> goal of covering 250 million people with the fastest nationwide LTE network.
> We are targeting 300 million people with LTE by the end of 2015.

*Id*. at p. 5.  This unlicensed expansion includes the MetroPCS brand:

> As part of the integration following the business combination, we are in the
> process of decommissioning the MetroPCS CDMA network and redundant cell
> sites, while also integrating select MetroPCS assets in certain metropolitan areas
> into the overall network.  We have moved more than 70% of the MetroPCS
> spectrum licenses onto the T-Mobile network to provide faster LTE performance
> in many key markets.  Upon completion of the migration of the MetroPCS
> customer base, we expect to have approximately 61,000 equivalent cell sites,
> including macro sites and certain distributed antenna system ("DAS") network
> nodes from the MetroPCS network.

*Id*. at p. 8.

16.     T-Mobile, including through its affiliates, is a member of various SSOs that

promulgate specifications and standards.  For example, T-Mobile, including through its affiliates,

is a 3GPP member organization and has knowledge of ETSI specifications promulgated by

3GPP.  *See, e.g.*,

http://webapp.etsi.org/3gppmembership/Results.asp?Member=ATIS&Member=ETSI.

17.     T-Mobile's 2G, 3G, and 4G LTE wireless networks ("Infringing Wireless

Networks") are used by customers in the United States to place cellular phone calls, in addition

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                  7

to being used to send and receive data services, which are offered by – or on behalf of – T-Mobile.  T-Mobile promotes and advertises the use of its services, including its Infringing Wireless Networks, which are available to users in this District, and throughout the United States. (*See, e.g.*, http://www.t-mobile.com/coverage.html.)  Indeed, T-Mobile proclaims that "T-Mobile is the fastest growing wireless company in the U.S., based on customer growth in 2014, currently providing wireless communications services, including voice, messaging and data, to over 55 million customers in the postpaid, prepaid, and wholesale markets," and "this means offering customers a great service on a nationwide 4G Long-Term Evolution ('LTE') network, devices when and how they want them, and plans that are simple, affordable and without unnecessary restrictions." 2014 Annual Report, p. 3.

18.    Access to T-Mobile's Infringing Wireless Networks is offered by T-Mobile in accordance with various "rate plans" by which T-Mobile sets the price that its users pay for accessing the Infringing Wireless Networks.  T-Mobile offers these "rate plans" through, for example, T-Mobile stores and websites.  When purchased from T-Mobile, on information and belief, such "rate plans" authorize third parties, such as customers and users, to access T-Mobile's Infringing Wireless Networks.  *See, e.g.*, http://www.t-mobile.com/cell-phone-plans.html; http://www.t-mobile.com/cell-phone-plans/mobile-internet.html.  According to T-Mobile, a "customer is generally defined as a SIM card with a unique T-Mobile identity number which is associated with an account that generates revenue. Branded customers generally include customers that are qualified either for postpaid service, where they generally pay after incurring service, or prepaid service, where they generally pay in advance.  Wholesale customers include M2M and MVNO customers that operate on our network, but are managed by wholesale partners."  T-Mobile 2014 Annual Report, pg. 31.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                     8

19.     According to T-Mobile, the Infringing Wireless Networks benefit T-Mobile's business and customers. *See id.* at 6 ("The success of our Un-carrier proposition and continued modernization of the network has further repositioned T-Mobile as a provider of dependable high-speed LTE service with a full range of desirable devices and provides our customers with an unrivaled customer experience.").  Furthermore, T-Mobile realizes further example benefits through network license fees to other operators. *See id*. at 27 ("Other revenues increased $81 million, or 25%, in 2014, compared to 2013.  The increase was primarily due to higher co-location rental income from leasing space on wireless communication towers to third parties and higher lease income associated with spectrum license lease agreements resulting from spectrum swap transactions.").

20.     On information and belief, T-Mobile sells and offers for sale mobile devices, service plans, and/or SIM cards configured to access its Infringing Wireless Networks, to place and receive voice calls, and to send and receive data.  On information and belief, T-Mobile promotes transfer between radio access technologies (including security negotiations) in violation of Huawei's patent rights.  Additionally, on information and belief, T-Mobile promotes seamless transfer techniques between 3GPP and non-3GPP networks.

21.     Based on information and belief, T-Mobile makes, uses, operates, and/or sells access to wireless networks in the United States, including its Infringing Wireless Networks, that directly infringe one or more claims of the patents asserted herein.  For example, these wireless networks utilize network components, such as MMEs, SGWs, PGWs, SGSNs, eNodeBs, *etc*., and interfaces there between, which infringe one or more claims of the asserted patents, by, for example, making, using, and/or selling a wireless network configured to allow and/or carry out techniques for accomplishing a transfer between networks.

22.     Additionally, T-Mobile makes, uses, sells, offers for sale, and/or imports into the United States, service plans, mobile phones, and/or SIM cards that contribute to the infringement of one or more claims of the asserted patents when used by customers and other users to put the Infringing Wireless Networks into use for their benefit.  For example, T-Mobile – or those on its behalf – sells service plans, mobile phones and/or SIM cards specifically configured to access and make use of T-Mobile's Infringing Wireless Networks, including for example, to make use of the network's features and techniques for accomplishing a transfer between networks.  The service plans, mobile phones and/or SIM cards are offered for sale and sold to customers in the United States by T-Mobile (or an authorized reseller), including through its website and various storefronts, and when used as instructed by T-Mobile, access and use T-Mobile's Infringing Wireless Networks, including, for example, the networks' transfer capabilities and techniques.

23.     Such service plans, mobile phones and/or SIM cards are specifically configured to access and make use of T-Mobile's Infringing Wireless Networks by T-Mobile or under its authorization, including, for example, access to the network's transfer capabilities and techniques.  On information and belief, once configured to access T-Mobile's Infringing Wireless Networks, such service plans, mobile phone and/or SIM cards are at least material components that do not have any substantial uses other than to access T-Mobile's Infringing Wireless Networks.  On information and belief, T-Mobile knows such service plans, mobile devices and/or SIM cards to be especially made or especially adapted for infringement of the patents asserted herein, and not staple articles or commodities of commerce suitable for substantial noninfringing use.

24.     Furthermore, based on information and belief, T-Mobile induces infringement by others of one or more claims of the patents asserted herein.  For example, T-Mobile takes active

steps to promote and encourage the use of its Infringing Wireless Networks and the infringing

networking interfaces and components within those networks.  On information and belief, T-

Mobile is aware of the patents asserted herein, at least as of the filing of this lawsuit, and knows,

or should have known, that the inducing acts described herein constitute infringement of the

asserted patents.

   25.    T-Mobile takes specific steps to actively induce others – such as, for example

customers and operators – to access and use its Infringing Wireless Networks.  For example, and

without limitation, on information and belief, T-Mobile actively induces direct infringement of

one or more claims of the asserted patents, by others, by promoting, instructing, offering, and

encouraging others to use mobile devices, service plans and/or SIM cards configured to access

its Infringing Wireless Networks so that they may, for example, use the Infringing Wireless

Networks' transfer capabilities and techniques.  Furthermore, T-Mobile also actively promotes

the use of its Infringing Wireless Networks' transfer capabilities and techniques, including for

example and without limitation, by way of T-Mobile storefronts, authorized resellers, customer

service and sales representatives, and/or its internet sales website.  Such active promotion

includes advertising access to and transfer between different radio access technologies in its

Infringing Wireless Networks and offering SIM cards, service plans, and/or mobile devices that

are used to access T-Mobile's Infringing Wireless Networks and allow use of the transfer

capabilities and techniques of the Infringing Wireless Networks.  And, on information and belief,

T-Mobile knows or should know that such sales and promotions actively induce others to

directly infringe one or more claims of the asserted patents, including for example, by prompting

them to use the mobile devices, service plans and/or SIM cards to access T-Mobile's Infringing

Wireless Networks and to use its Infringing Wireless Networks' transfer capabilities and techniques.

26.     As another example, T-Mobile provides and/or authorizes the providing of instruction manuals, product manuals, and other materials (*e.g.*, with the sale of a product and/or offered on its website) for customers' and other users' mobile devices, service plans, and/or SIM cards that are configured to access T-Mobile's Infringing Wireless Networks, and for example, to accomplish a transfer between different radio access technologies in its Infringing Wireless Networks.  *See generally* https://support.t-mobile.com/community/phones-tablets-devices/android/zte-zmax/content.  And, on information and belief, T-Mobile knows or should know that such materials and instructions actively induce others to directly infringe one or more claims of the asserted patents, including by instructing them to use the mobile devices, service plans and/or SIM cards to access T-Mobile's Infringing Wireless Networks and to use its Infringing Wireless Networks' transfer capabilities and techniques.

27.     Additionally, T-Mobile and/or its authorized retailers operate T-Mobile stores throughout the United States, including operating T-Mobile stores in this District, such as in Longview, Texas. *See* http://www.t-mobile.com/store/cell-phone-longview-tx-3333.html.  Each of these stores, on information and belief, sells, promotes, and instructs the use of T-Mobile's Wireless Infringing Networks, including but not limited to transfer capabilities and techniques of those networks, by for example, selling, and/or offering for sale, mobile devices, service plans and/or SIM cards configured to access T-Mobile's Infringing Wireless Networks so as to allow use of the Infringing Wireless Networks' transfer capabilities and techniques.

28.     To protect its intellectual property rights (and the interests of other actual or prospective licensees), Huawei contacted T-Mobile on June 6, 2014, to discuss Huawei's

Licensing Program.  Huawei specifically identified patents from its portfolio and specific services offered by T-Mobile related to Huawei's patents, such as LTE and VoLTE.  To continue discussions, and to provide additional information to T-Mobile regarding the identified patents, Huawei offered that the parties enter into a mutual non-disclosure agreement.

29.     On June 23, 2014, T-Mobile refused to sign the mutual non-disclosure agreement and rejected the idea of exchanging information under the mutual non-disclosure agreement.

30.     On June 30, 2014, Huawei reiterated to T-Mobile Huawei's need for a mutual non-disclosure agreement to allow Huawei to provide T-Mobile non-public information, such as an initial analysis regarding possible infringement of Huawei's patents.

31.     On September 3, 2014, T-Mobile responded and continued to refuse to enter into any non-disclosure agreement.

32.     To date, T-Mobile has refused to enter into a mutual non-disclosure agreement, and therefore, is unwilling to even open negotiations regarding a license.  Such refusals by T-Mobile have made further explanation by Huawei to T-Mobile impossible.

33.     At least in view of the foregoing, and upon information and belief, T-Mobile is an unwilling licensee to the asserted patents and is unwilling to enter into good faith negotiations. Because T-Mobile has used and continues to use Huawei's intellectual property without a license, Huawei has no choice but to file an action with this Court to enforce its patent rights.

## THE PARTIES

34.     Huawei Technologies Co. Ltd. is a Chinese corporation with its principal place of business at Bantian, Longgang District, Shenzhen, People's Republic of China.

35.     Defendant T-Mobile US, Inc. is a Delaware corporation with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006.  On information and belief, T-

Mobile US, Inc. may be served through its registered agent for service, Corporation Service

Company, 2711 Centerville Rd Suite 400, Wilmington, Delaware 19808.

36.     Defendant T-Mobile USA, Inc. is a Delaware corporation with its principal place

of business at 12920 SE 38th Street, Bellevue, Washington 98006, and is a wholly-owned

subsidiary of T-Mobile US, Inc.  On information and belief, T-Mobile USA, Inc. may be served

through its registered agent for service, Corporation Service Company, 211 E. 7th St. Suite 620,

Austin, Texas 78701-3218.  On information and belief, Defendant T-Mobile USA, Inc. has

research and development facilities at 7668 Warren Pkwy, Frisco Bridges Tech Campus, Frisco,

Texas 75034.

## JURISDICTION AND VENUE

37.     This is a civil action for patent infringement arising under the patent laws of the

United States, 35 U.S.C. § 101 *et seq*.  Jurisdiction is conferred on this Court pursuant to 28

U.S.C. §§ 1331 and 1338(a).

38.     The patents-at-issue in this action are U.S. Patent Nos. 9,060,268 ("the '268

patent") and 8,625,527 ("the '527 patent") (collectively, the "Asserted Patents").

39.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).  On

information and belief, T-Mobile has engaged in activities including: transacting business in this

district and purposefully directing its business activities, including the use of Infringing Wireless

Networks in this District, and the sale or offer for sale of services and goods to this District to

aid, abet, or contribute to the infringement of third parties in this District.

40.     The Court has personal jurisdiction over T-Mobile at least because it has

continuous business contacts in the State of Texas and in this District.  T-Mobile has engaged in

business activities including transacting business in this District and purposefully directing its

business activities, including the use of Infringing Wireless Networks in this District, and the

sale or offer for sale of services and goods to this District to aid, abet, or contribute to the

infringement of third parties in this District.  For example, T-Mobile–either directly or through

those acting on its behalf–offers its Infringing Wireless Networks in this District, as shown at

http://www.t-mobile.com/coverage.html.  As another example, T-Mobile – either directly or

through those acting on its behalf – has stores and/or authorized retailers in this District. *See*

http://www.t-mobile.com/store-locator.html.  Furthermore, on information and belief, T-Mobile

USA, Inc. operates a Network Operations Center (NOC) in Frisco, Texas, that monitors its

network 24-hours a day to ensure a quick response to outages and emergency situations.

**COUNT ONE: INFRINGEMENT OF**
**U.S. PATENT NO. 9,060,268**

41.     Huawei realleges and incorporates by reference Paragraphs 1-40 above, as if fully

set forth herein.

42.     The USPTO duly and properly issued the '268 patent, entitled "Negotiating

Security Capabilities During Movement of UE," on June 16, 2015.  The '268 patent was duly

assigned to Huawei, which is the assignee of all right, title, and interest in and to the '268 patent

and possesses the exclusive right of recovery for past, present, and future infringement.  Each

and every claim of the '268 patent is valid and enforceable.  A true and correct copy of the '268

patent is attached hereto as Exhibit 1.

43.     In violation of 35 U.S.C. § 271, T-Mobile has infringed, contributed to the

infringement of, and/or induced others to infringe at least claim 3 of the '268 patent by, among

other things, making, using, offering for sale, selling, and/or importing into the United States

unlicensed systems, products, and/or services that infringe at least claim 3 of the '268 patent.

Such unlicensed systems, products, and/or services include, by way of example and without

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    15

limitation, T-Mobile's Infringing Wireless Networks and/or the components thereof which allow for security negotiation during a movement between different radio access technologies (e.g., between a 3G and an LTE network).  In addition, on information and belief, users of T-Mobile's Infringing Wireless Networks infringe the '268 patent by putting the claimed system into service by, for example, using the security negotiation during a movement between different radio access technologies (e.g., between a 3G and an LTE network).

44.     For example, T-Mobile has directly infringed at least claim 3 of the '268 patent by i) making, leasing, and/or using its wireless networks; ii) making, offering for sale, and/or selling its services; and iii) making, using, offering for sale, selling, and/or importing into the United States components (such as MMEs, SGSNs, RNCs, *etc.*) in a manner that infringes at least claim 3 of the '268 patent and by using such components in its networks.

45.     On information and belief, T-Mobile has infringed at least claim 3 of the '268 patent by inducing others, including users of its infringing networks through subscription plans, mobile devices and/or SIM cards that it sells and/or offers, to infringe at least claim 3 of the '268 patent in violation of 35 U.S.C. § 271(b).

46.     On information and belief, T-Mobile takes active steps to induce infringement of at least claim 3 of the '268 patent by others, including its customers, network users, and authorized resellers, and T-Mobile takes such active steps knowing that those steps will induce, encourage and facilitate direct infringement by others.  Such active steps include, but are not limited to, encouraging, advertising (including by internet websites, television, store displays, print advertisements, *etc.*), promoting, and instructing others to use and/or how to use the mobility capabilities (which include security negotiations) of the Infringing Wireless Networks via its service plans, mobile devices, and/or SIM cards.  Such service plans, mobile devices,

and/or SIM cards including those made, sold, offered for sale, and/or imported by T-Mobile. Additionally, by example and without limitation, T-Mobile actively induces authorized resellers, including by instructing, promoting, encouraging, providing or selling promotional materials, for use in facilitating sales of its service plans, mobile devices, and/or SIM cards, that allow access to the Infringing Wireless networks, including but not limited to the security negotiation capabilities during a movement between different radio access technologies (e.g., between a 3G and an LTE network) for the benefit of the respective users.  Additionally, specific examples of steps taken in furtherance of its active inducement by others are set forth above in Paragraphs 24-27, which are incorporated by reference.

47.    On information and belief, T-Mobile knows or should know that such activities induce others to directly infringe at least claim 3 of the '268 patent, including for example, by prompting them to use the mobile devices, service plans and/or SIM cards to access T-Mobile's Infringing Wireless Networks and to negotiate security during a movement between different radio access technologies (e.g., between a 3G and an LTE network).

48.    On information and belief, T-Mobile contributes to the infringement of at least claim 3 of the '268 patent by others, including its customers, network users, and authorized resellers.  Acts by T-Mobile that contribute to the infringement of others include, but are not limited to, the sale, offer for sale, and/or import by T-Mobile of service plans, devices and/or SIM cards.  Such service plans, mobile devices and/or SIM cards are especially adapted for use with and/or access to T-Mobile's Infringing Wireless Networks and are not suitable for substantial noninfringing use.  On information and belief, T-Mobile knows such service plans, mobile devices and/or SIM cards to be especially adapted for use with its Infringing Wireless Networks, including but not limited to for use with the network's security negotiation

capabilities and that such service plans, mobile devices and/or SIM cards are not suitable for substantial noninfringing use.

49.     By way of at least this Complaint, T-Mobile knows of the '268 patent and performs acts that it knows, or should know, induce, and/or contribute to the direct infringement of at least claim 3 of the '268 patent by third parties.

50.     T-Mobile undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '268 patent, which has been duly issued by the USPTO, and is presumed valid.  For example, since at least the filing of this action, T-Mobile has been aware of an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '268 patent and that the '268 patent is valid.  On information and belief, T-Mobile could not reasonably subjectively believe that its actions do not constitute infringement of the '268 patent, nor could it reasonably subjectively believe that the patent is invalid.  Despite that knowledge, subjective belief, and the objectively high likelihood that its actions constitute infringement, T-Mobile has continued its infringing activities.  As such, T-Mobile willfully infringes the '268 patent.

51.     By its actions, T-Mobile has injured Huawei and is liable to Huawei for infringement of the '268 patent pursuant to 35 U.S.C. § 271.

## COUNT TWO: INFRINGEMENT OF
## U.S. PATENT NO. 8,625,527

52.     Huawei realleges and incorporates by reference Paragraphs 1-51 above, as if fully set forth herein.

53.     The USPTO duly and properly issued the '527 patent, entitled "Method and System for Maintaining Session Continuity when Changes Occur at the Terminal during a Session," on January 7, 2014.  The '527 patent was duly assigned to Huawei, which is the

assignee of all right, title, and interest in and to the '527 patent and possesses the exclusive right

of recover for past, present, and future infringement.  Each and every claim of the '527 patent is

valid and enforceable.  A true and correct copy of the '527 patent is attached hereto as Exhibit 2.

54.     In violation of 35 U.S.C. § 271, T-Mobile has infringed, contributed to the

infringement of, and/or induced others to infringe at least claims 1 and/or 41 of the '527 patent

by, among other things, making, using, offering for sale, selling, and/or importing into the United

States unlicensed systems, products, and/or services that infringe at least claims 1 and/or 41 of

the '527 patent.  Such unlicensed systems, products, and/or services include, by way of example

and without limitation, T-Mobile's Infringing Wireless Networks and/or the components thereof

which allow for transfers between different networks or radio access technologies.  In addition,

on information and belief, users of T-Mobile's Infringing Wireless Networks infringe the '527

patent by putting the claimed system into service by, for example, using the Infringing Wireless

Networks' capabilities and techniques, such as Single Radio Voice Call Continuity (SRVCC)

and/or enhanced Single Radio Voice Call Continuity (eSRVCC) during transfers between

different networks or radio access technologies, for example, between LTE 4G and 2/3G

networks.

55.     For example, T-Mobile has directly infringed at least claims 1 and/or 41 of the

'527 patent by i) making, leasing, and/or using its wireless networks; ii) making, offering for

sale, and/or selling its services; and iii) making, using, offering for sale, selling, and/or importing

into the United States components (such as an Application Servers (ASs), Service Centralization

and Continuity ASs (SCC ASs), Access Transfer Gateways (ATGWs)/ Session Border

Controllers (SBCs),  and/or Media Gateways (MGWs), *etc*.) in a manner that infringes at least

claims 1 and/or 41 of the '527 patent and by using such components in its networks. According

to T-Mobile:

> And, when we rolled out VoLTE, we deployed a little known feature from the
> LTE Advanced set of standards called enhanced Single Radio Voice Call
> Continuity (eSRVCC). Our customers don't − and shouldn't − care that one of the
> challenges with VoLTE is what happens if you leave the LTE footprint. By using
> eSRVCC, we ensure calls don't get dropped when users move into areas that
> don't have LTE − that's in contrast to Verizon's (still) un-launched VoLTE.

*See* https://newsroom.t-mobile.com/issues-insights-blog/innovating-the-mobile-internet-

blog.htm.

> Enhanced Single Radio Voice Call Continuity (eSRVCC) is a new LTE
> Advanced function and we're excited to be the first to deploy it in the U.S. All of
> this basically helps ensure that your capable phone won't drop a call if you leave
> an LTE area and it switches to 4G HSPA+ or 2G coverage.

*See* http://multimediacapsule.thomsonone.com/t-mobileusa/t-mobile-brings-voice-over-lte-to-

seattle.

56.     On information and belief, T-Mobile has infringed at least claims 1 and/or 41 of

the '527 patent by inducing others, including users of its infringing networks through

subscription plans, mobile devices and/or SIM cards that it sells and/or offers, to infringe at least

claims 1 and/or 41 of the '527 patent in violation of 35 U.S.C. § 271(b).

57.     On information and belief, T-Mobile takes active steps to induce infringement of

at least claims 1 and/or 41 of the '527 patent by others, including its customers, network users,

and authorized resellers, and T-Mobile takes such active steps knowing that those steps will

induce, encourage and facilitate direct infringement by others.  Such active steps include, but are

not limited to, encouraging, advertising (including by internet websites, television, store displays,

print advertisements, etc.), promoting, and instructing others to use and/or how to use the transfer

capabilities (which include security negotiations) of the Infringing Wireless Networks via its

service plans, mobile devices, and/or SIM cards.  Such service plans, mobile devices, and/or SIM cards including those made, sold, offered for sale, and/or imported by T-Mobile.  Additionally, by example and without limitation, T-Mobile actively induces authorized resellers, including by instructing, promoting, encouraging, providing or selling promotional materials, for use in facilitating sales of its service plans, mobile devices, and/or SIM cards, that allow access to the Infringing Wireless networks, including but not limited to the Infringing Wireless Networks' capabilities and techniques for transfers between different networks or radio access technologies for the benefit of the respective users.  Additionally, specific examples of steps taken in furtherance of its active inducement by others are set forth above in Paragraphs 24-27 which are incorporated by reference.

58.     On information and belief, T-Mobile knows or should know that such activities induce others to directly infringe at least claims 1 and/or 41 of the '527 patent, including for example, by prompting them to use the mobile devices, service plans and/or SIM cards to access T-Mobile's Infringing Wireless Networks and to use the Infringing Wireless Networks' capabilities and techniques for transfer between different networks or radio access technologies.

59.     On information and belief, T-Mobile contributes to the infringement of at least claims 1 and/or 41 of the '527 patent by others, including its customers, network users, and authorized resellers.  Acts by T-Mobile that contribute to the infringement of others include, but are not limited to, the sale, offer for sale, and/or import by T-Mobile of service plans, devices and/or SIM cards.  Such service plans, mobile devices and/or SIM cards are especially adapted for use with and/or access to T-Mobile's Infringing Wireless Networks and are not suitable for substantial noninfringing use.  On information and belief, T-Mobile knows such service plans, mobile devices and/or SIM cards to be especially adapted for use with its Infringing Wireless

Networks, including but not limited to for use with the Infringing Wireless Networks'
capabilities and techniques for transfers between different networks or radio access technologies,
and that such service plans, mobile devices and/or SIM cards are not suitable for substantial
noninfringing use.

60.     By way of at least this Complaint, T-Mobile knows of the '527 patent and
performs acts that it knows, or should know, induce, and/or contribute to the direct infringement
of at least claims 1 and/or 41 of the '527 patent by third parties.

61.     T-Mobile undertook and continues its infringing actions despite an objectively
high likelihood that such activities infringed the '527 patent, which has been duly issued by the
USPTO, and is presumed valid.  For example, since at least the filing of this action, T-Mobile
has been aware of an objectively high likelihood that its actions constituted, and continue to
constitute, infringement of the '527 patent and that the '527 patent is valid.  On information and
belief, T-Mobile could not reasonably subjectively believe that its actions do not constitute
infringement of the '527 patent, nor could it reasonably subjectively believe that the patent is
invalid.  Despite that knowledge, subjective belief, and the objectively high likelihood that its
actions constitute infringement, T-Mobile has continued its infringing activities.  As such, T-
Mobile willfully infringes the '527 patent.

62.     By its actions, T-Mobile has injured Huawei and is liable to Huawei for
infringement of the '527 patent pursuant to 35 U.S.C. § 271.

### DEMAND FOR JURY TRIAL

63.     Huawei hereby demands trial by jury on all claims and issues so triable.

**PRAYER FOR RELIEF**

64.     Wherefore, Huawei respectfully requests that this Court enter judgment against T-Mobile as follows:

A.  That each of the Asserted Patents has been infringed by T-Mobile;

B.  That T-Mobile's infringement of the Asserted Patents has been willful;

C.  An award of damages adequate to compensate Huawei for the patent infringement that has occurred, together with pre-judgment interest and costs;

D.  Permanently enjoin T-Mobile from further infringement or alternatively, award an ongoing royalty for T-Mobile's post-verdict infringement, payable on each product or service offered by T-Mobile that is found to infringe one or more of the patents asserted herein, and on all future products and services that are not colorably different from those found to infringe;

E.  An award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

F.  A finding that this is an exceptional case and an award to Huawei of its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

G.  Such other relief, including other monetary and equitable relief, as this Court deems just and proper.

Dated:  January 15, 2016                      Respectfully submitted,

By: */s/ Jane Du*
    Ruffin Cordell
    Texas Bar No. 04820550
    cordell@fr.com
    Linda Kordziel
    DC Bar No. 446386
    kordziel@fr.com
    **FISH & RICHARDSON P.C.**
    1425 K Street, N.W., 11th Floor
    Washington, D.C. 20005
    Telephone: (202) 783-5070
    Facsimile: (202) 783-2331

    Thomas H. Reger II
    Texas Bar No. 24032992
    reger@fr.com
    Carl E. Bruce
    Texas Bar No. 24036278
    bruce@fr.com
    David B. Conrad
    Texas Bar No. 24049042
    conrad@fr.com
    Jane Du
    Texas Bar No. 24076355
    du@fr.com
    **FISH & RICHARDSON P.C.**
    1717 Main Street, Suite 5000
    Dallas, TX 75201
    Telephone: (214) 747-5070
    Facsimile: (214) 747-2091

    David Barkan
    California Bar No. 160825
    barkan@fr.com
    **FISH & RICHARDSON P.C**.
    500 Arguello Street, Suite 500
    Redwood City, CA 94063
    Telephone: (650) 839-5070
    Facsimile: (650) 839-5071

    Kevin Su
    Massachusetts Bar No. 663726
    su@fr.com
    **FISH & RICHARDSON P.C.**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT        24

One Marina Park Drive
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

**COUNSEL FOR PLAINTIFF HUAWEI
TECHNOLOGIES CO. LTD.**